MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

SUSAN E. BADGER (CABN 124365)
Assistant United States Attorney
   450 Golden Gate Ave., Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7200
   Fax: (415) 436-7234
   E-Mail: Susan.Badger@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09 0343 JSW |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| JOHN MAKA, | Date: August 11, 2011<br>Time: 2:00 p.m.<br>Court: Honorable Jeffrey S. White |
| Defendant. | |

**TABLE OF CONTENTS**

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   A.  Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   B.  Applicable Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   C.  Government's Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   D.  Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*United States v. Davoudi,* 172 F.3d 1130 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 10

*United States v. Gossi,* 608 F.3d 574 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**FEDERAL STATUTES/RULES**

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 7

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Crim. P. 11(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

On August 20, 2009, defendant John Maka pled guilty to a single count of mail fraud, in violation of 18 U.S.C. § 1341, as charged in a Superseding Information filed July 28, 2009. The defendant entered his guilty plea pursuant to an agreement under Rule 11(c)(1)(A) and (c)(1)(B) of the Federal Rules of Criminal Procedure. Sentencing is scheduled to take place on August 11, 2011 at 2:00 p.m. before this Court. The government submits the following sentencing memorandum in order to (1) discuss the offense conduct; (2) discuss the applicable sentencing guidelines; and (3) advise the Court of its sentencing recommendation.

## DISCUSSION

### A. Offense Conduct

The Presentence Report accurately recounts defendant John Maka's conduct in this case. As part of the plea agreement, Maka entered a guilty plea to executing a mail fraud scheme in connection with a mortgage loan which he obtained from a mortgage lender named SIB Mortgage. Maka agreed that the base offense level and restitution will be determined based on the loss to SIB, as well as on losses sustained in connection with several other fraudulent mortgage loans in which he was involved between 2001 and 2005.

During the early to mid-2000s, when real estate prices were rising and lending standards were relatively lenient, Maka apparently decided to take advantage of the opportunity to make money by purchasing real estate and then selling it at a profit. The problem with that plan was that Maka did not have sufficiently good credit or financial resources to obtain loans to purchase the properties. Accordingly, he engaged in the type of fraud that was not uncommon during the years before the collapse of the real estate and mortgage lending industry. That is, Maka recruited other individuals, including relatives, friends, and friends of business colleagues, to act as "straw" borrowers. Either as a favor to Maka, or as a result of being paid a fee, those individuals agreed to sign loan applications and obtain loans in their own names. They did so with the understanding that they would have no responsibility for making the loan payments, and that Maka

would take care of all such payments, property taxes, etc. In apparent collusion with others in the mortgage lending business, such as mortgage brokers, title company officers, and real estate agents, Maka was able to obtain loans and purchase several properties. After making the purchases, Maka used the properties as collateral to obtain additional straw-borrower loans.

At the end of the day, the house of cards collapsed. Maka could not actually afford to engage in this type of real estate speculation and he was not able to make the payments on the loans. Maka defaulted and the last lender in each chain of transactions was left holding the bag. Four lenders ended up sustaining losses of over $7 million.

**512 Warren Road**: The charge to which Maka pled guilty pertains to a loan he obtained through fraud using the property at 512 Warren Road, San Mateo, as collateral. Maka had originally purchased the property in 1997. Between 1998 and 2001, using the property as collateral, Maka obtained additional re-finance or purchase loans by utilizing straw-buyers. As described in the Presentence Report, in 2001, straw-buyer James Geyer obtained a loan in the amount of $1,837,500 from a lender named SIB Mortgage. Maka used some of the net proceeds from that loan in order to purchase the property on Polhemus Road, discussed below.

Ultimately, Maka defaulted on the SIB Mortgage loan. Through its counsel, SIB reported that it recovered a net of $930,299 from the sale of the property after foreclosing. The difference between the outstanding principal at the time of default ($1,837,500) and the net proceeds from the sale of the collateral is $907,201. SIB also reported that it had to spend $55,702 in real estate taxes and expenses during the period between foreclosure and sale of the property.

**Polhemus Road property**: In 2001, Maka purchased a seven-acre parcel of undeveloped property on Polhemus Road in San Mateo County for $900,000. He had ambitions to develop the property by building multiple residential units. After acquiring the property, Maka engaged in a series of transactions using the property as collateral. In several cases, Maka made it appear that arm's-length sale transactions took place, when

that was not the case. He also recorded fake deeds of trust which made it appear that lenders loaned money and accepted the Polhemus Road property as collateral, when in fact, no such loan took place. Through this process and the use of a fraudulent appraisal on at least one occasion, the apparent value of the Polhemus Road property soared. Eventually, in March 2005, a private group of investors named Diversified Loan Services, Inc. loaned straw-borrower Tuilatai Sevelo, one of Maka's brothers-in-law, $4.5 million and took a first deed of trust on the property. In December 2005, another group of investors named Reichert-Lengfeld, loaned straw-borrower Sevelo $2.5 million and took a second deed of trust on the property.

Maka ended up defaulting on the Diversified and Reichert-Lengfeld loans. According to an accounting provided by Reichert's representative, the outstanding principal balance at the time of default was the full $2.5 million. Reichert foreclosed on Sevelo in November 2006, and obtained title to the property. It also acquired the debt to Diversified and made $727,115 in mortgage payments to Diversified in order to forestall Diversified's foreclosure. Reichert ultimately decided to stop making payments and defaulted.

Diversified foreclosed on Reichert on August 7, 2007 and took title to the property. According to Diversified, at the time that Maka defaulted on the loan, the outstanding principal balance was the full $4.5 million. The property has been problematic not only for Reichert, but for Diversified. As confirmed by an appraisal obtained by the government for purposes of this sentencing proceeding, there are issues concerning access, slope, and possible geologic hazards that must be addressed before developability can be addressed. The appraiser, a certified appraiser with Hulberg and Associates, San Jose, California, came to the conclusion that it is reasonably probable that it will be possible to develop the site with one custom house. In order to calculate restitution, the government retained Hulberg and Associates to conduct an appraisal of the value of the property as of August 7, 2007, when Diversified foreclosed and gained title to the property. Hulberg and Associates determined that the value of the Polhemus Road

property as of that date was $900,000. They also advised that the property is currently on the market for $800,000.

**One Daniel Burnham Court, #707**: This property is a condominium in San Francisco which Maka acquired using his son Francis Maka as a straw-borrower. In October 2005, using straw-borrower Maria Sakurada, Maka obtained a re-finance loan in the amount of $862,500 from Countrywide Home Loans, which was subsequently acquired by Bank of America. Several months earlier, in August 2005, Maka obtained a $700,000 re-finance loan from World Savings by using Sakurada as a straw-buyer. Maka used some of the net proceeds from that loan to finance the purchase the house at 80 Tobin Clark Drive, discussed below. When Maka obtained the Countrywide loan in October 2005, the World Savings mortgage was paid off.

Maka defaulted on the loan to Countrywide. For several years, title to the property was tied up in civil litigation relating to a dispute in which Maka had no responsibility. According to records received from Bank of America regarding this property, it has foreclosed and it now holds title. To the best of the government's knowledge, Bank of America has not moved to sell the property. The government has used a reliable online database source to research the likely current value of the property, and has determined that the value is approximately $919,000. Because that value is greater than the original principal of the Countrywide loan ($862,500), it is anticipated that Bank of America will not sustain a loss in connection with the loan on this property.

**80 Tobin Clark Drive**: In 2002, using his brother-in-law Sosefo Tatola as the straw-buyer, Maka purchased the house at 80 Tobin Clark Drive, Hillsborough. Maka and his family resided at this property until they were evicted. In October 2005, Maka engineered a sham sale transaction between Tatola and straw-buyer Maria Sakurada. Bank of America funded a loan in the amount of $1,987,500 in Sakurada's name. As noted above, Maka used some of the net proceeds from the World Savings re-fi loan on the Daniel Burnham Court property to finance this purchase.

///

Maka made some payments toward principal on the Bank of America loan, but ultimately defaulted. The records received from Bank of America show that the unpaid principal balance as of May 14, 2008 was $1,986,792. Bank of America foreclosed and sold the property on January 8, 2010 and received $1,681,283 in net proceeds from the sale.[1] The difference between the unpaid principal and the net proceeds is $305,509.

**B. Applicable Sentencing Guidelines**

Maka pled guilty to mail fraud, in violation of 18 U.S.C. § 1341, which is addressed in Section 2B1.1 of the Sentencing Guidelines. In this case, as in most fraud cases, the calculation of the applicable sentencing guidelines is determined primarily by the loss sustained as a result of the defendant's conduct. Maka pled guilty to mail fraud in connection with the $1,837,500 loan that he obtained through straw-buyer James Geyer from SIB Mortgage. As part of the plea agreement, at paragraph 7, Maka agreed that the loss is not limited to the loss sustained by SIB Mortgage, and is based also on losses sustained by (1) Countrywide in connection with the $862,500 loan secured by the property at Daniel Burnham Court; (2) Bank of America in connection with the $1,987,000 loan secured by the Tobin Clark Drive property; (3) Diversified Loan Services in connection with the $4.5 million loan secured by the Polhemus Road property; and (4) Reichert-Lengfeld in connection with the $2.5 million loan also secured by the Polhemus Road property.

In *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999), the Ninth Circuit held that guideline loss in mortgage loan fraud cases "is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from the assets pledged to secure the loan." *Id.*, at 1135. While the principal unpaid at the time the offense is discovered is a sensible measure of culpability, the value of the pledged asset – i.e. the real property which is the

---

[1] Bank of America has not provided any report of, or documentation for, expenses incurred as a result of foreclosing on, or holding, either the Daniel Burnham Court or Tobin Clark properties.

security for the loan – is measured as of the time of sentencing. *Id.* Under U.S.S.G. § 2B1.1, App. N. 3(C), the sentencing court need only make a reasonable estimate of the loss.

Applying the *Davoudi* rule to the facts of each loan discussed above, the losses are as follows:

For SIB Mortgage (Warren Road), the difference between the outstanding principal balance at time of default ($1,837,500) and the net proceeds from the sale of the collateral ($930,299) is $907,201.

For Diversified (Polhemus Road), the difference between the outstanding principal balance ($4,500,000) and the amount that Diversified can reasonably expect to recover from sale of the property ($800,000) is $3,700,000.

For Reichert-Lengfeld (Polhemus Road), the outstanding principal balance was $2,500,000 and Reichert will not recover any proceeds from the sale of the property.

For Bank of America (Tobin Clark Drive), the difference between the outstanding principal balance ($1,986,792) and the net proceeds from the sale of the property ($1,681,283) is $305,509.

As discussed above, it is anticipated that Bank of America will not sustain a loss in connection with the Daniel Burnham Court property.

Accordingly, the losses for calculating the guidelines are:

| **LENDER** | **PROPERTY** | **LOSS** |
|---|---|---|
| SIB Mortgage | Warren Road | $907,201 |
| Diversified | Polhemus Road | $3,700,000 |
| Reichert-Lengfeld | Polhemus Road | $2,500,000 |
| Bank of America | Tobin Clark Drive | $305,509 |
| Countrywide | Daniel Burnham Court | none |
| | **TOTAL LOSS** | **$7,412,710** |

1    The maximum penalty for a violation of Section 1341 at the time of the offense of
2    conviction was 30 years imprisonment. Accordingly, the Probation Officer has correctly
3    determined that the starting point for determining the base offense level pursuant to
4    Section 2B1.1(a) is level 7.  The maximum penalty is stated correctly at page two of the
5    Plea Agreement.  However, the parties made an error in the plea agreement when they
6    stated that the base offense level for the offense starts at level 6.  As to specific offense
7    characteristics, twenty levels are added to the base offense level for the loss over $7
8    million, but less than $20 million.  *See*, U.S.S. G. § 2B1.1(b).

9    The government agrees with the Probation Officer's assessment that Maka has
10   earned a three-level reduction for acceptance of responsibility.  The Probation Officer
11   awards that reduction based on the fact that Maka entered a guilty plea, admitted his
12   criminal conduct to her, and agreed to pay restitution.  In the government's view, these
13   factors in addition to others, strongly support a determination that Maka has accepted
14   responsibility for his actions.  As a starting place, the prosecution here did not start with a
15   complaint or indictment, as many cases do.  When the government agents were reaching
16   the end of their investigation, they interviewed Maka's son, Francis Maka, who was a
17   straw-buyer on the Daniel Burnham Court loan.  Not long after that, undersigned counsel
18   was contacted by counsel for Maka, who advised that Maka wished to take full
19   responsibility for all of his offense conduct, was prepared to make full restitution, and
20   was willing to assist the government in its investigation of other individuals – especially
21   those working in the mortgage brokerage, real estate, and title industry.  As a result of
22   these conversations, a plea agreement was reached and Maka entered a guilty plea before
23   this Court to the single count information.  Following through on his commitment to take
24   full responsibility for all of his criminal conduct, Maka agreed that the sentencing
25   guidelines would be based on all of the losses that he caused and agreed to make
26   restitution for all of those losses.  Undersigned counsel can advise the Court that there
27   was never any quibbling over these matters during plea negotiations.  Unquestionably,
28   ///

Maka has accepted responsibility for his conduct and has demonstrated that he is prepared to deal with the consequences.

Undersigned counsel can also advise the Court that as part of Maka's commitment to attempt to assist the government in its continuing investigation of these matters, Maka followed through and had a sequence of long debriefing sessions, in the presence of his counsel, with undersigned counsel and government agents. While those sessions did not end up being fruitful in terms of developing any new prosecutions, and did not meet the standard of "substantial assistance" pursuant to U.S.S.G. § 5K1.1, during those sessions Maka never minimized his conduct or deflected responsibility. He has remained consistent in taking full personal responsibility for his actions.

These reasons, as well as the fact that Maka's early commitment to enter a guilty plea resulted in a significant saving of resources on the part of the Court and the government, justify a finding by the Court that Maka has clearly demonstrated acceptance of responsibility under U.S.S.G. § 3E1.1.

Consistent with its commitments in the plea agreement as to how the guidelines should be calculated in this case, the base offense level starts at level 6; twenty levels are added as a result of the loss, bringing the base offense level to level 26; and a three-level reduction is applied for acceptance of responsibility bringing the adjusted base offense level to level 23. Maka falls within Criminal History Category I. Accordingly, pursuant to the government's agreement in the plea agreement, the applicable sentencing guideline range is 46 to 57 months.

**C. Government's Sentencing Recommendation**

The mortgage fraud in which Maka engaged over a period of four years was extensive and sophisticated. Maka apparently decided that he wanted to make money in California's booming real estate market. The fact that he was not sufficiently creditworthy to obtain the loans that he needed in order to purchase properties, keep up the payments, and purchase additional properties did not deter him from his get-rich-quick goals. He acted completely irresponsibly in embarking on, and then staying on, this

path even though the signs that his ambitions were not going to pan out turned up early on. Completely ignoring obligations of truthfulness and candor to prospective lenders, Maka simply recruited relatives, friends, and strangers with good credit to represent themselves as the true borrowers. This included involving his son Francis and two brothers-in-law. In doing so, Maka not only recklessly put at risk the credit of these individuals, but also exposed them to criminal liability. As it turned out, Maka's lack of creditworthiness was an accurate predictor of how all his sham transactions were going to turn out. Maka eventually defaulted on all of the loans, and four of five lenders sustained losses. In the case of the two groups of investors who loaned a total of $7 million secured by the Polhemus Road property, the losses were significant.

The nature and circumstances of the offense conduct here are serious, and should be taken into account when imposing sentence under 18 U.S.C. § 3553(a). That Section provides that the sentence should take into account the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. All of those concerns are applicable here, especially as the state and nation attempt to recover from the devastating economic impact of the collapse of the mortgage lending industry. Certainly one factor in that collapse is the fact that persons such as Maka acted with such flagrant disregard for the law and the potential consequences of defaulting on loans they could not afford.

There are also factors under Section 3553(a) that weigh in favor of mitigation here. One is the fact that Maka suffers from serious medical conditions, in particular an aneurysm in his brain that is currently being managed medically, rather than surgically, and prostate cancer. The second is that, as described above, Maka has demonstrated exceptional personal acceptance of responsibility for his actions. The government has no reason to believe that Maka will engage in this same type of conduct again. He clearly has a loving family which has offered tremendous support through the legal process. It is difficult to believe that he would cause them, or himself, any additional hardship and suffering by undertaking any new criminal conduct.

1    In light of all of these circumstances, the government recommends that the Court
2    impose a sentence of 51 months imprisonment.  This is a sentence within the guideline
3    range of 46 to 57 months, as agreed to by the government in its plea agreement.  It is also
4    a sentence of the low end of the applicable sentencing guideline range determined by the
5    Probation Officer.  A sentence of 51 months is sufficient, but not greater than necessary,
6    to comply with the purposes of sentencing set forth in Section 3553(a).

**D. Restitution**

Restitution is governed by the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A.  In *United States v. Davoudi*, *supra,* 172 F.3d at 1135, the Ninth Circuit held that the law governing the calculation of restitution in mortgage fraud cases is "distinct" from the calculation of loss for determining the applicable sentencing guidelines.  Restitution on foreclosed properties is determined by adding the outstanding principal balance and accrued foreclosure costs, and then deducting the fair market value of the property at the time of foreclosure, that is, the date the victim lender took control of the property and had the ability to sell it.  *See, Davoudi,* at 1134; *United States v. Gossi*, 608 F.3d 574, 578 (9th Cir. 2010).

Applying these rules to the circumstances here, the restitution owed to lenders is as follows:

On the Warren Road loan, SIB Mortgage, which is now Sovereign Bank, reported that it had to spend $55,702 in real estate taxes and expenses during the time period between foreclosure and sale of the property.  Accordingly, SIB / **Sovereign's loss for restitution purposes is a total of $962,903.**

Diversified loaned Maka $4.5 million secured by the Polhemus Road property.  It foreclosed on August 7, 2007 and has not yet sold the property.  As discussed above, the government has obtained a retrospective appraisal of the property, which determined that the property was worth $900,000 at the time of foreclosure.  Accordingly, **Diversified's loss for restitution purposes is $3.6 million.**

Reichert-Lengfeld lost its entire $2.5 million principal, and incurred additional

expenses of $727,115 when it made payments to Diversified in order to avoid Diversified's foreclosure. Accordingly, **Reichert is owed $3,227,115 in restitution.**

Finally, as discussed above, Bank of America sustained a loss of $305,509 in connection with its loan on the Tobin Clark Drive property. Bank of America did not document any expenses incurred. Accordingly, **Bank of America is owed $305,509 in restitution.**

For each of the above entities, the government has provided contact information in terms of where and to whom restitution payments should be directed.

DATED: August 4, 2011                 Respectfully submitted,

                                                MELINDA HAAG
                                                United States Attorney

                                      _____/s/_____
                                      SUSAN E. BADGER
                                      Assistant United States Attorney